IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DICK GERGERIAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 13 C 5753 |
| v. ) | |
| ) | Magistrate Judge |
| CAROLYN W. COLVIN, Acting ) | Maria Valdez |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

This action was brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying Plaintiff Dick Gergerian's claim for Disability Insurance Benefits. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Plaintiff's request to reverse the decision of the Commissioner is granted.

## BACKGROUND

### I. PROCEDURAL HISTORY

On June 24, 2010, Gergerian filed a claim for Disability Insurance Benefits, alleging disability since October 30, 2009. The claim was denied initially and upon reconsideration, after which he timely requested a hearing before an Administrative Law Judge ("ALJ"), which was held on January 24, 2012. Gergerian personally

appeared and testified at the hearing and was represented by counsel. Medical expert Dr. Sheldon J. Slodki, M.D., and vocational expert Linda Gels also testified.

On April 27, 2012 the ALJ issued a partially favorable decision on Gergerian's claim for Disability Insurance Benefits, finding that Gergerian was disabled beginning August 8, 2011, but not before that date under the Social Security Act. On June 11, 2013, the Social Security Administration Appeals Council denied Gergerian's request for review, leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by the District Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II.     FACTUAL BACKGROUND[1]

### A.     Background

Gergerian was born on March 15, 1948 and was sixty-three years old at the time of the ALJ hearing. (R. 37, 155.) He lived with his girlfriend and had a Master's degree in Education. (*Id*.) Gergerian previously worked as a salesman and alleges disability due to difficulty with his vision. (R. 39.)

### B.     Medical Evidence

On July 19, 2010, Plaintiff underwent an eye exam at the Chicago Lighthouse, a center for the blind or visually impaired, at the request of the Department of Human Services. (R. 225.) He complained of dry eyes, flashes of light, blurry vision, and floaters, and had a vitreous hemorrhage as a result of his proliferative diabetic retinopathy. (R. 225, 229.) He was assessed with a visual acuity of 20/65 in his right eye and 20/80 in the left. (R. 225.) On September 12,

---

[1] The following facts from the parties' briefs are undisputed unless otherwise noted.

2010, non-examining state consultative physician, Dr. James Madison, M.D., completed a Physical Residual Functional Capacity ("RFC") Assessment. (R. 230-38.) Dr. Madison indicated that Plaintiff had no exertional, postural, manipulative, or communicative limitations. (R. 231-34.) However, Plaintiff was visually limited in his near and far acuity, and his field of vision, with no limitations in his depth perception, accommodation, or color vision. (R. 233.) In addition, Plaintiff had no environmental limitations, except he was to avoid concentrated exposure to hazards such as machinery or heights. (R. 234.) Dr. Madison concluded that Plaintiff's statements regarding his loss of vision were credible and consistent with the objective medical findings and the limitations indicated in the Physical RFC Assessment. (R. 237.)

On August 8, 2011, Plaintiff was examined by Dr. Daniel Greenberg, M.D. (R. 246-47.) Plaintiff complained of poor vision in his left eye and stated that four days prior, he had lost vision in his right eye. (*Id.*) Plaintiff had bilateral vitreous hemorrhage. (R. 246-47, 292.) He also had moderate cataracts in his right eye. (R. 292.) On August 15, 2011, Plaintiff underwent right eye surgery, performed by Dr. Aaron B. Weinberg, M.D. (R. 289.) Plaintiff had a retina membrane peel, panretinal photocoagulation, and pars plana vitrectomy on his right eye. (R. 289.) After the surgery, Drs. Greenberg and Weinberg completed a Visual Questionnaire. (R. 293-96.) Dr. Greenberg indicated that Plaintiff suffered from a complete loss of vision and that he was legally blind. (R. 294.) After best correction, the visual acuity in his right eye was 20/200, and his left eye was hand movements only. (R. 295.)

Additionally, Drs. Greenberg and Weinberg both indicated that Plaintiff could not perform any vision-related activities if he were placed in a competitive work environment and that Plaintiff's symptoms were severe enough to interfere with attention and concentration needed to perform even simple work tasks. (R. 293-96.)

### C. Plaintiff's Testimony

Plaintiff testified that his vision problems began before October 2009. (R. 39.) Previously, he worked as a carpet salesman from 1995-2008. (R. 40, 43-44.) He last worked October 31, 2008. (R. 58.) He lost his job because it became increasingly difficult for him to perform his duties, including identifying customers or employees, filling out sales checks, and entering information into the register and computer. (R. 39, 59.) At the time, Plaintiff's employer provided him no accommodation, and he used a magnifying lens to read materials. (R. 59.) Plaintiff's duties consisted of stocking, moving rugs, helping customers select rugs, and supervising up to four employees. (R. 40.) During the course of his duties, he did paperwork and recorded information into a computer. (R. 41.) He was on his feet for four hours and sat for four hours. (R. 42.) The job required lifting up to fifty-pounds and the smallest item he would pick up and use during work was a pen. (R. 42-43.)

At the time of the hearing, most of Plaintiff's day was spent seated, listening to television, sleeping, and eating. (R. 45.) He assisted with things around the house by trying to fold clothes, give his dogs treats, and microwaving his own food as long as it was one minute or less. (R. 46.) He could not see the clock on the microwave and could not read the times on TV dinners. (*Id.*) When he shopped with his

4

girlfriend, he used a credit card. (*Id.*) If he used cash, his girlfriend pulled it out of his wallet. (*Id.*) He had not been able to guarantee the accuracy of his change since the early part of 2011. (R. 46-47.) On average he left his home three times a week to go to the store with his girlfriend, downstairs to the laundry, and church. (*Id.*) Since he lost work and before his eye surgery, Plaintiff's day had been the same. (R. 47-48.) Plaintiff stated his visual acuity had been at the level it was before the surgery for approximately six months to a year. (R. 52.)

In July of 2010, he could use a pen and sign his name if someone told him where to sign. (R. 53, 54.) However, he would not be able to focus on a document and tell if it was his signature. (R. 55.) He could not read magazines, newspapers, or books. (*Id.*) At the time of the ALJ hearing, the smallest object he could pick up and use was a remote control. (R. 52.) He could not dial a phone because of the small buttons. (*Id.*) He could focus on his silverware to eat, but he had difficulty cutting food because he could not always see it. (R. 53.) If a dime was on the table, he could try and pick it up and would know it was a dime because dimes were thinner than anything else. (R. 56.) However, for the last year and half, he would not be able to focus on the face of it or tell any information from the face. (R. 56-57.) He had no difficulties standing, but his balance was a little awkward because he could not see. (R. 63.) He could walk fairly well but sometimes had a balance problem and he was cautious and afraid that things would be in his way. (*Id.*) When walking on sidewalks he worried about cracks or elevated portions of the sidewalk. (*Id.*)

In August of 2011, Plaintiff began treatment with Dr. Greenberg. (R. 60.) He was referred by the St. Francis Resurrection Clinic ("St. Francis"). (*Id.*) He had no vision exams at St. Francis because the clinic lacked the capability. (R. 61.) Since his last exam at Lighthouse in July of 2010, he had no other eye examinations until he began treatment with Dr. Greenberg, because he lacked insurance. (*Id.*)

### D. <u>Medical Expert Testimony</u>

Medical expert ("ME"), Dr. Sheldon J. Slodki, M.D., testified at the ALJ hearing. (R. 64-75.) Dr. Slodki stated that when Plaintiff was attended by Dr. Greenberg on August 8, 2011, he met Listing 2.02, loss of acuity with remaining vision in better eye, after best correction at 20/200 or less. (R. 65-66.) Dr. Slodki stated that on October 17, 2011, Plaintiff's visual acuity was 20/400 on the right, and hand movement at three feet on the left, and pre-operative Plaintiff had finger counting on both sides. (R. 66.) Dr. Slodki also stated that prior to August 8, 2011, Plaintiff did not meet or equal any listing and there was no degree of limitation indicated in the record visual or otherwise. (R. 67.) Dr. Slodki noted that the only discussion of limitation regarding the period preceding August 2011 was the state agency references on August 12, 2010. (R. 67-68.) Dr. Slodki concluded that based on the record, other than the state agency references, he could not extrapolate forward or backward on whether there was a degree of limitation evident at any earlier time. (R. 69.)

### E. Vocational Expert

Vocational expert ("VE") Linda Gels also testified. (R. 76.) The VE stated that from 1980 to 2008, Plaintiff worked as salesperson, and his past work was at the medium to heavy exertional level (R. 77-78.) The ALJ asked the VE whether the following hypothetical person could perform any of Plaintiff's past work. (R. 79.) The hypothetical person would be of the same age, education, and work experience as Plaintiff, and there would be some visual concerns with the ability to generally read, write, and use numbers. (R. 79-80.) The hypothetical person would be able to perform work with the following and no other additional limitations: may perform a full range of work at all exertional levels; may not climb ladders, ropes, or scaffolds; and must avoid exposure to workplace hazards, such as exposed unprotected heights or excavations, exposed unprotected dangerous moving machinery. (R. 80.) The VE responded that with those limitations, he could perform his prior work. (*Id.*) The ALJ then asked whether any work at the heavy or very heavy exertional level existed under the limitations. (*Id.*) The VE responded that those were not typical work settings. (R. 81.) The VE also stated that at the heavy level there were some assembler jobs that ranged up to heavy, but were mostly medium, with about 2,000 available statewide and more available at the medium level. (R. 82.)

The VE then stated that unskilled medium machine feeder, with about 2,000 available at the medium level, and dining room attendant, with about 1,500 regionally available. (R. 82-83.) The ALJ instructed the VE to assume the same information and limitations but also a bilateral deficiency in vision such that the

7

individual retained the capacity to focus on, discern, pick up, and use an object that was a little smaller than a pen. (R. 84.) The ALJ then asked what impact, if any, would that have relative to the prior activities or to the unskilled light and medium or medium and heavy jobs the VE discussed. (R. 84-85.) The VE responded that it would not have any impact. The ALJ then asked what impact the smallest item used would have relative to prior work. (R. 85.) The VE responded that the DOT addressed visual acuity by defining near acuity as twenty inches or less, and far acuity as twenty feet or more. (R. 86.) The VE then stated that for sales clerk the DOT listed both near and far acuity as occasionally, and she did not think the sales duties required fine precision tools. (*Id.*) Further, for assembly and machine feeder the nature of the work was gross handling and that a person would not be doing fine manipulation activities. (R. 87.) The VE then stated that discerning the edge of a dime would not have a bearing on the hypothetical person's prior job or the medium or heavy jobs listed, and if the individual did not have the capacity for near or far acuity and limited to counting fingers with either of his eyes, it would preclude the prior work. (R. 87-88.)

**F.** **ALJ Decision**

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of October 30, 2009. (R. 23.) At step two, the ALJ concluded that since October 30, 2009, Plaintiff had the severe impairments of diabetes mellitus, diabetic retinopathy, OD (right eye) vitreous hemorrhage, cataracts, and hypertension. (*Id.*) The ALJ then concluded that

beginning on August 8, 2011, Plaintiff had the severe impairments of diabetes mellitus, diabetic retinopathy, bilateral vitreous hemorrhage, worsening visual acuity of 20/200 in the better eye, status post vitrectomy, cataracts and hypertension. (*Id.*) At step three, the ALJ concluded that prior to August 8, 2011, Plaintiff's impairments alone or in combination, did not meet or medically equal a Listing. (*Id.*)

Before step four, the ALJ found that Claimant had the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: due to bilateral deficiency in vision, Plaintiff was able to focus upon, discern, pick-up and use objects no smaller than a pen; may not climb ladders, ropes, or scaffolds; and must avoid exposure to workplace hazards such as exposed unprotected heights and excavations, as well as dangerous moving machinery. (R. 24.) Based on this RFC, the ALJ determined at step four that Claimant could not perform any past relevant work. (R. 27.) Finally, at step five, based upon the Plaintiff's age, education, work experience, and RFC, the ALJ concluded that prior to August 8, 2011, Plaintiff could perform jobs existing in significant numbers in the national economy. (*Id.*)

## DISCUSSION

### I. ALJ LEGAL STANDARD

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which

9

has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? 20 C.F.R. § 416.920(a)(4).

An affirmative answer at either step three or step five leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step three, precludes a finding of disability. (*Id.*) The claimant bears the burden of proof at steps one through four. (*Id.*) Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. (*Id.*)

## II. JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial

evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Skinner*, 478 F.3d at 841; *see also Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (holding that the ALJ's decision must be affirmed even if "'reasonable minds could differ'" as long as "the decision is adequately supported") (citation omitted).

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ denies benefits to a claimant, "he must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ must at least minimally articulate the "analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe* ex rel. *Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions . . . and must adequately articulate his analysis so that we can follow his reasoning . . . ."); *see Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005).

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the

Commissioner, not the court. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *see Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014) ("This 'sound-bite' approach to record evaluation is an impermissible methodology for evaluating the evidence.").

## III. ANALYSIS

Plaintiff argues that the ALJ's decision was in error because: (1) the ALJ failed to provide a proper basis for the RFC and credibility findings; and (2) the ALJ failed to apply SSR 83-20 and did not explain his conclusion of why Plaintiff's onset date was August 8, 2011.

### A. Credibility

Plaintiff argues that the ALJ erred by failing to properly explain the basis for his credibility findings, leading to a flawed RFC. In assessing Plaintiff's credibility, the ALJ stated:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible prior to August 8, 2011, to the extent they are inconsistent with the residual functional capacity assessment.

(R. 26-27.)

This boilerplate credibility template has been roundly criticized by the Seventh Circuit, which has noted that although "the assessment of claimant's ability to work will often . . . depend heavily on the credibility of her statements

12

concerning the 'intensity, persistence and limiting effects' of her symptoms," the template "implies that the ability to work is determined first and is then used to determine the claimant's credibility." *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012).

The template is thus inconsistent with SSR 96-7p(4),[2] which states that a claimant's statements about the intensity or persistence of symptoms cannot be disregarded solely because they are not substantiated by objective medical evidence. *Bjornson*, 671 F.3d at 646; SSR 96-7p(4); *see Hall v. Colvin*, 778 F.3d 688, 689 (7th Cir. 2015). When evaluating a claimant's credibility, the ALJ must also consider "(1) the claimant's daily activity; (2) the duration, frequency, and intensity of pain; (3) the precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions." *See Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004); *see* SSR 96-7p at *3. In addition, an ALJ must articulate specific reasons for the credibility assessment, supported by evidence, to allow the individual and the court to understand the weight the ALJ gave to the claimant's allegations and the reasons for that weight. *Giles* ex rel. *Giles v. Astrue*, 483 F.3d 483, 488-89 (7th Cir. 2007) (citing SSR 96-7p).

The ALJ in this case failed to offer any reasons for the credibility assessment, nor did he support the assessment with evidence in the record. The Commissioner contends that the ALJ "reasonably distrusted" Plaintiff's claims of disabling visual problems prior to August 2011 based on his lack of treatment after July 2010, and

---

[2] Interpretive rules, such as Social Security Rulings ("SSR"), do not have force of law but are binding on all components of the Agency. 20 C.F.R. § 402.35(b)(1); *accord Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999).

13

that "Plaintiff would have more urgently pursued low-cost treatment options between October 2009 and August 2011 if his limitations were as extreme as he alleged." (Def.'s Mem. in Opp'n at 4.) The Commissioner further argues that the ALJ gave significant weight to the opinion of Dr. Slodki, who mentioned that Gergerian had no medical restrictions prior to August 8, 2011, and notes from that date stated that his vision had decreased only in the past four or five days.

The Court agrees with Plaintiff that the Commissioner provides only *post hoc* rationales for the ALJ's decision. Although the ALJ did discuss Gergerian's treatment history, the decision never uses that as a rationale to find his claims of disabling limitations prior to August 2011 to be incredible. *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (holding that the government's argument that limited treatment history proved a condition was not serious was "an impermissible *post hoc* rationale" because it was not included in the ALJ's credibility analysis). The ALJ did state that the conservative nature of Plaintiff's treatment prior to August 8, 2011 supported the RFC finding, but he did not mention that as a factor in the credibility analysis. Furthermore, even if it had been listed as a factor, it would have been in error. Plaintiff testified that he did not previously seek treatment because he lacked insurance, and the ALJ should have more thoroughly questioned him about the reasons he did not seek treatment on a regular basis. *See id.* (explaining that "an ALJ can[not] rely on an uninsured claimant's sparse treatment history to show that a condition was not serious without exploring why the treatment history was thin"); *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir.

2012) ("Although a history of sporadic treatment . . . can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference."). The ALJ was required to assess Plaintiff's testimony and specify what weight, if any, he assigned to the testimony to allow this Court an opportunity to perform a meaningful review. If Plaintiff's testimony was not credible, the ALJ was obligated to explain the basis of that assessment. If, on the other hand, Plaintiff's testimony was credible, the ALJ was required to explain why the testimony did not support a finding of disabled prior to August 8, 2011.

**B.     RFC**

The ALJ's RFC assessment relied on the objective medical evidence, the conservative nature of Plaintiff's treatment prior to August 2011, and his level of daily activity. As explained above, the ALJ did not explore the reasons for the lack of treatment, and therefore the negative inference was not based on substantial evidence. The ALJ also did not assert why Plaintiff's level of daily activity was inconsistent with his claims of disabling visual impairments before August 2011. The ALJ pointed to no evidence or testimony demonstrating that Gergerian's daily activities were more limited after August 2011 than they were since his alleged onset date. Indeed, Plaintiff testified that his daily activities had been essentially the same since he stopped working, except then he was able to walk a little more. The Court is therefore unable to properly review the RFC assessment.

Based on its conclusion that remand is necessary for the above reasons, the Court need not explore in detail the remaining errors claimed by Plaintiff. The Court emphasizes that the Commissioner should not assume these issues were omitted from the opinion because no error was found. The Court admonishes the Commissioner that, on remand, special care should be taken to ensure that Plaintiff's onset date is evaluated using the parameters outlined in SSR 83-20.

## **CONCLUSION**

For the foregoing reasons, Plaintiff Gergerian's request to reverse the decision of the Commissioner is granted. The Court finds that this matter should be remanded to the Commissioner for further proceedings consistent with this Order.

**SO ORDERED.**  **ENTERED:**

**DATE:	February 19, 2016**	_____
	**HON. MARIA VALDEZ**
	**United States Magistrate Judge**